# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **TERRY E. STONE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:06-1186** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's "Motion for Judgment Upon the Administrative Record." Docket Entry No. 14. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 18.

For the reasons stated below, the undersigned recommends that Plaintiff's "Motion for Judgment Upon the Administrative Record" be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

Case 3:06-cv-01186   Document 21   Filed 06/20/08   Page 1 of 41 PageID #: 72

# I.  INTRODUCTION

Plaintiff filed his application for Disability Insurance Benefits on January 24, 2003, alleging that he had been disabled since November 10, 2002, due to a back disorder and hepatitis C.  *See,* Docket Entry No. 11, Attachment ("TR") 54-56, 59.  Plaintiff's application was denied both initially (TR 34-35) and upon reconsideration (TR 36-37).  Plaintiff subsequently requested (TR 45) and received (TR 28-31) a hearing.  Plaintiff's hearing was conducted on June 10, 2005, by Administrative Law Judge ("ALJ") D. Lyndell Pickett.  TR 253.  Plaintiff and Vocational Expert, Dr. Kenneth Anchor, appeared and testified.  TR 254.

On September 8, 2005, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 16-27.  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3.  The claimant's lumbar degenerative disc disease, status post three lumbar discectomies, hepatitis C, and possible rheumatoid arthritis of the hands are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(c).
>
> 4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

2

6.  The claimant has the following residual functional capacity: ability to perform sedentary work exertion requiring no climbing of ladders, ropes, and scaffolds, no crawling, no more than occasional stooping, kneeling, crouching and climbing of ramps and stairs, no preparation of food, and requiring frequent but not constant handling and fingering.

7.  The claimant is unable to perform any of his past relevant work (20 C.F.R. § 404.1565).

8.  The claimant is a "younger individual" (20 C.F.R. § 404.1563).

9.  The claimant has "a limited education" (20 C.F.R. § 404.1564).

10.  The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. § 404.1568).

11.  The claimant has the residual functional capacity to perform a significant range of sedentary work (20 C.F.R. 404.1567).

12.  Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.19 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.  Examples of such jobs include work as tableworker with 460,000 jobs nationally, cashier II with 600,000 jobs nationally, telephone quotation clerk with 340,000 nationally, and credit card control clerk with 280,000 jobs in the nation.

13.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 404.1520(g)).

TR 26-27.

On October 19, 2005, Plaintiff timely filed a request for review of the hearing decision.

TR 13-15.  On November 17, 2006, the Appeals Council issued a letter declining to review the

case (TR 4-8), thereby rendering the decision of the ALJ the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).

3

If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to a back disorder and hepatitis C. TR 54-56, 59.

On March 5, 1993, Plaintiff visited Dr. Newton P. Allen, Jr. for a follow-up examination after a recent emergency room visit for "heart fluttering" which occurred 10 minutes after eating. TR 209-211. Dr. Allen noted that Plaintiff had "some symptoms of meralgia paresthetica in his right thigh" when he stood for long periods of time, but he did not complain of back pain. *Id.* Dr. Allen diagnosed Plaintiff with PUD/GERD, palpitations secondary to GE reflux, and obesity. *Id.* Dr. Allen noted that Plaintiff smoked approximately one and a half packs of cigarettes per day and that he had been allergic to Novacaine as a child. *Id.* Dr. Allen further noted that Plaintiff had an impressive family history of premature ischemic heart disease. *Id.* He prescribed Pepcid for three months, gave Plaintiff a Nicoderm pamphlet, and referred him to Smoke-Enders. *Id.* Dr. Allen advised Plaintiff to avoid aspirin, Advil, ibuprofen, alcohol, and caffeine. *Id.*

On July 16, 1993, Plaintiff returned to Dr. Allen for a follow-up examination regarding his dyspepsia. TR 208. Dr. Allen reported that Pepcid had "led to much improvement," but that Plaintiff still required "a lot" of Rolaids after meals. *Id.* Dr. Allen also noted Plaintiff's abnormal LFTs and that Plaintiff denied history of hepatitis or promiscuity. *Id.* Plaintiff was diagnosed with persistent dyspepsia, abnormal LFTs, and right meralgia paresthetica. *Id.* Dr. Allen ordered an EGD and hepatitis serology. *Id.*

4

On August 2, 1993, Dr. Allen noted that Plaintiff's EGD revealed antral gastritis and mild duodenitis, but his biopsy was unremarkable and there was no evidence of "H-phlori." TR 208. Dr. Allen recommended that Plaintiff stop smoking. *Id.*

On July 11, 1994, Plaintiff visited Dr. Allen for a follow-up examination regarding his abdominal discomfort and GE reflux. TR 206-207. Dr. Allen noted Plaintiff's right thigh numbness, alternating diarrhea and constipation, some hematochezia, some palpitations, and increased weight. *Id.* Dr. Allen also reported that, while Plaintiff's electrolytes were unremarkable, his "BUN 17," creatinine 1.0, alkaline phosphatase, "GAMMA GT," "SGOT," and "SGPT," were all elevated. *Id.* Dr. Allen diagnosed Plaintiff with a history of hypercholesterolemia, abnormal liver function tests consistent with hepatitis, persistent GE reflux, family history of ischemic heart disease, meralgia paresthetica, smoking, history of hematochezia, possible internal hemorrhoids, and palpitations secondary to GE reflux. *Id.* Dr. Allen told Plaintiff to discontinue smoking and he prescribed Plaintiff Carafate, an "H2 blocker," and Anusol HC suppository. *Id.* Dr. Allen noted to recheck Plaintiff's LFTs and to check his hepatitis serology. *Id.*

On March 13, 1995, Plaintiff visited Dr. Allen complaining of persistent hip pain, "worse on the left than right." TR 205. Dr. Allen found that Plaintiff had full range of motion of his hips and a very mild tenderness on internal rotations. *Id.* He tested Plaintiff for hepatitis B antigen, which was negative, and hepatitis C antibody, which was positive. *Id.* Dr. Allen diagnosed Plaintiff with hip pain, GERD, and mild, chronic hepatitis C. *Id.* He prescribed Plaintiff Pepcid and Daypro, and ordered an EGD. *Id.* Dr. Allen noted that he would consider a hip/pelvis ultrasound. *Id.*

5

On July 21, 1995, Dr. Craig M. Coulam noted that Plaintiff's liver ultrasound revealed a "markedly irregular ... echogenicity pattern" which suggested "numerous small hyperechoic nodules." TR 231. Dr. Coulam opined that these nodules were suggestive of "metastatic liver disease or a diffusely infiltrating hepatoma." *Id.*

On August 7, 1995, Dr. Ryan Roberts performed a liver biopsy on Plaintiff to determine whether Plaintiff had cirrhosis of the liver. TR 102-103. During the procedure, Plaintiff experienced a "vasovagal reaction," but recovered without loss of consciousness or use of atropine. *Id.*

On September 18, 1995, Dr. Allen noted that Plaintiff was undergoing alpha interferon therapy for his hepatitis C with Dr. Roberts. TR 204. Plaintiff also complained of nasal congestion, clogged ears, right thigh discomfort, and numbness. *Id.* Dr. Allen diagnosed Plaintiff with meralgia paresthetica, chronic hepatitis C, and nasal congestion. *Id.* Dr. Allen noted that Plaintiff was a smoker. *Id.* He prescribed Sudafed. *Id.* Dr. Allen's plan was to "consider Amitriptyline versus Tegretol," to consider a neurosurgical referral, and for Plaintiff to stop smoking and wear loose fitting pants. *Id.*

On November 6, 1995, Plaintiff visited Dr. Roberts complaining of positional left lower chest pain that radiated around to his side and back. TR 203. Plaintiff also complained of some mild intermittent diarrhea following his alpha interferon injections. *Id.* Dr. Roberts diagnosed Plaintiff with musculoskeletal chest pain, stable and chronic active hepatitis C with fibrosis, and mild interferon-induced diarrhea. *Id.* He increased Plaintiff's ibuprofen to twice per day for the next three to four days and then discontinued it, ordered a liver profile and complete blood count, and suggested Plaintiff return to the clinic in four weeks. *Id.*

6

On December 5, 1995, Plaintiff returned to Dr. Roberts with the same complaints of intermittent chest pain as the previous visit. TR 202. Dr. Roberts diagnosed Plaintiff with chronic active hepatitis C with fibrosis unresponsive to alpha interferon therapy, musculoskeletal chest pain, and mild interferon-induced diarrhea. *Id.* He discontinued Plaintiff's interferon therapy, and ordered a SMA-22 and complete blood count. *Id.* Dr. Roberts noted that Plaintiff could resume work-related activities beginning in January, and suggested that Plaintiff return to the clinic in six months. *Id.*

On February 5, 1996, Plaintiff visited Dr. Allen complaining of low back pain and difficulty lying down or sitting, with his discomfort being worse while sitting or riding in a car. TR 201. Dr. Allen diagnosed Plaintiff with back pain and chronic hepatitis C. *Id.* He prescribed Mepergan Fortis and a Medrol Dosepak. *Id.*

On March 27, 1997, Plaintiff returned to Dr. Allen for an examination. TR 198-200. Dr. Allen noted Plaintiff's history of present illness as: peptic ulcer disease, and chronic active hepatitis with fibrosis, but no cirrhosis, and unresponsive to interferon therapy. *Id.* Dr. Allen listed Plaintiff's problems as chronic active hepatitis, mild hyperglycemia, gastroesophageal reflux, and smoking. *Id.* Dr. Allen recommended a diet and exercise program and prescribed "AXID AR 2" for GE reflux. *Id.* Laboratory tests revealed Plaintiff's elevated results for "BA%," "MONO," "MCH," "GLU," "ALT," "AST," "GGT," and "ALP." TR 225-228. Plaintiff's laboratory tests yielded low results for "MPV." *Id.* Plaintiff's urinalysis revealed an abnormal amber color. TR 229. Other laboratory results were normal. TR 225-228.

On February 9, 1998, Plaintiff visited Dr. Allen complaining of intermittent back discomfort, meralgia paresthetica, and right lower lateral thoracic wall pain. TR 197. Dr. Allen

noted that a hepatic ultrasound revealed "diffuse multinodular echogenic change throughout both lobes of [Plaintiff's] liver,... consistent with ... hepatic cirrhosis." *Id.* Dr. David M. Rowe noted of the liver ultrasound that a "differential diagnosis would include multiple hepatic metastases, multinodular cirrhosis, or other diffuse infiltrative hepatic disease." TR 230.

On February 24, 2000, Plaintiff visited Dr. John Jordan at the Madison Family Practice complaining of right side chest pain. TR 142. Dr. Jordan diagnosed Plaintiff with right thoracic pain and chronic hepatitis C, ordered a chest x-ray, and ordered laboratory work. *Id.* The following day, Dr. Jordan called Plaintiff to inform him that the results of his chest x-ray were normal. *Id.*

On March 2, 2000, Plaintiff returned to Dr. Jordan for a follow-up examination regarding his complaints of chest pain. TR 141. Dr. Jordan discussed Plaintiff's x-ray and gave him some ideas on how to deal with the pain, including watching how he drove and using heat. *Id.*

On August 16, 2001, Plaintiff visited Dr. Jordan complaining that he woke with low back discomfort that would occasionally radiate to his front side. TR 141. Plaintiff reported pain in his left buttock, left leg, knee, and calf. *Id.* Plaintiff also complained of pain in his right testicle on extended truck rides. TR 140. Dr. Jordan diagnosed Plaintiff with left sciatica, testicular pain, chronic hepatitis C, and tinea cruris. *Id.* Dr. Jordan ordered blood tests, prescribed Lodine, Lotrisone lotion, and Skelaxin, advised Plaintiff to do back stretches and apply ice/heat, and recommended that Plaintiff wear more supportive shorts. *Id.*

On August 24, 2001, Plaintiff's wife called Dr. Jordan and he informed her that Plaintiff's liver enzymes were elevated and that he should be cautious about using NSAIDs. TR

8

140. Dr. Jordan also informed her that Plaintiff's fasting glucose reading was slightly elevated. *Id.*

On September 10, 2001, Plaintiff visited Dr. Jordan complaining of pain in his left buttock and leg, although Naproxen and Skelaxin had relieved some of his low back pain. TR 139. Plaintiff also complained of difficulty walking and of cough/congestion. *Id.* Dr. Jordan diagnosed Plaintiff with left sciatica, left leg pain, bronchitis, and tobacco dependence. *Id.* Dr. Jordan ordered a lumbar x-ray and blood tests, and prescribed Plaintiff Skelaxin, Lodine, Liquibid, Proventil, and Advair. *Id.*

On September 11, 2001, Dr. Chi Y. Ryu of Skyline Medical Center commented that Plaintiff's lumbar spine flexion and extension radiographs revealed "degenerative joint disease L5-S1," but "no evidence of subluxation or spondylolisthesis." TR 146. Plaintiff called Dr. Jordan, who told him that the x-ray showed some degenerative changes. TR 138.

On September 21, 2001, Dr. Jordan referred Plaintiff to Dr. Robert Collins. TR 138.

On September 25, 2001, Dr. Jordan noted that Plaintiff's laboratory results from September 10, 2001, demonstrated improved liver function. TR 138.

On October 1, 2001, Dr. Jordan's office informed Plaintiff that his liver function was "better than when previously checked." TR 138. He was warned to be cautious with NSAIDs. *Id.*

On December 10, 2001, Plaintiff's wife called Dr. Jordan reporting that Plaintiff was experiencing severe back pain and that Dr. Collins would not prescribe pain medication. TR 137. Dr. Jordan called in a prescription for Lortab. *Id.*

9

On January 8, 2002, Plaintiff visited the emergency room at Skyline Medical Center complaining of a throbbing low back pain that radiated into his left buttock and thigh. TR 104-113. Dr. Torbert prescribed Plaintiff Methadone to ease his pain and scheduled an appointment for Plaintiff with Dr. Robert P. Uteg the next day. TR 108.

On January 9, 2002, Plaintiff returned to Skyline Medical Center for an MRI of his lumbar spine. TR 122-123. Dr. John J. Alarcon noted that Plaintiff's MRI showed "findings consistent with a recurrent left paracentral herniated nucleus pulposus, L5-S1, with secondary mild central stenosis and lateral recess stenosis on the left as well." *Id.* Dr. Alarcon further noted that "L4-5 demonstrates a mild combined central stenosis secondary to degenerative disc bulge and short pedicles," and "there appears to be a small posterior annular tear." *Id.*

Dr. Patrick L. Brien commented that a single lateral lumbar spine radiograph showed "anatomic alignment" of the "inferior margin of the L3 vertebral body, L4, L5, as well as the S1 segment." TR 119. After a physical examination by Dr. Uteg, Dr. Uteg diagnosed Plaintiff with a "recurrent left L5-S1 herniated disc." TR 116-117.

On January 10, 2002, Dr. Uteg performed microlumbar discectomy surgery on Plaintiff, noting that Plaintiff had undergone a lumbar microdiscectomy three weeks prior.[1] TR 114-115. Dr. Uteg reported that no infection was found at the site of Plaintiff's previous surgery and that a "very large disc fragment" was removed from beneath a nerve root at that location. *Id.* Other small disc fragments were removed and Plaintiff was discharged from the hospital the following day. *Id.*

---

[1]There are no medical records from Plaintiff's prior lumbar microdiscectomy.

10

On November 25, 2002, Plaintiff returned to Dr. Jordan requesting a referral to a neurosurgeon and complaining of worsening left-side low back and leg pain. TR 137. Plaintiff reported that he could walk without difficulty, although he was in constant pain. *Id.* He also stated that he had visited Dr. Yabut the previous week who had prescribed Talwin for his pain. *Id.* Dr. Jordan noted that Dr. Uteg had moved his practice out of state and that Plaintiff needed to establish himself with a new neurosurgeon. *Id.* Dr. Jordan diagnosed Plaintiff with chronic hepatitis C, degenerative disc disease, sciatica, and a history of hyperglycemia. *Id.* Blood was drawn for laboratory tests, and Plaintiff was advised to continue taking Talwin for pain. TR 136.

On November 27, 2002, Plaintiff complained to Dr. Jordan that Talwin was causing him to experience constipation. TR 136. Dr. Jordan prescribed Dulcolax suppositories. *Id.* Laboratory test results showed Plaintiff's elevated levels of glucose at 122 mg/dL, bilirubin (direct) at 0.5 mg/dL, alkaline phosphatase at 137 u/L, "AST" at 142 u/L, and "ALT" at 171 u/L. TR 143.

On December 2, 2002, Dr. Jordan refilled Plaintiff's Talwin prescription and noted his MRI scheduled for the following day. TR 138.

On December 3, 2002, Plaintiff underwent a lumbar spine MRI with and without contrast. TR 144-145. Dr. Steven M. Blount at Skyline Medical Center commented that the MRI showed "L5-S1 prior left laminectomy with enhancing epidural fibrois extending from the laminectomy defect ventrolaterally to the thecal sac." *Id.* Dr. Blount also wrote that a soft tissue signal at L5-S1 was consistent with "recurrent herniated nucleus pulposus" and that there was a "mild deformity of the ventrolateral aspect of the thecal sac." *Id.*

11

On December 5, 2002, Plaintiff visited Dr. Arthur R. Cushman at Middle Tennessee Neurosurgery complaining of severe pain in his back and left leg. TR 126-128. Dr. Cushman noted Plaintiff's two previous surgeries of December 17, 2001 and January 10, 2002. *Id.* After reviewing Plaintiff's most recent MRI and conducting a physical examination, Dr. Cushman diagnosed Plaintiff with "back pain with sciatica - probable recurrent disc herniation L5-S1." *Id.*

On December 12, 2002, Dr. Brett L. Thorstad commented that Plaintiff's lumbar spine CT scan with contrast demonstrated a "L4-5 minimal disc bulge," "left L5-S1 laminotomy," and "abnormal tissue within the left anterior epidural space with resultant posterior displacement and diminished opacification of the left S1 nerve root sleeve." TR 129-130. Plaintiff's CT scan also revealed a "L5-S1 mild diffuse disc bulge eccentric to the left with mild to moderate left foraminal stenosis" and a "conjoined right S1-S2 nerve root sleeve." *Id.* Dr. Thorstad also noted that a lumbosacral myelogram revealed "L4-5 mild anterior epidural deformity" and "L5-S1 degenerative disc disease with mild anterior epidural deformity and deformity of the left L5 as well as left S1 nerve root sleeves." TR 131-132. Laboratory tests of Plaintiff's cerebrospinal fluid collected during the myelogram revealed a high protein level at 60.7 mg/dL, but were otherwise normal. TR 133.

On December 23, 2002, Dr. Jordan faxed a referral form to Dr. Cushman, noting that Dr. Cushman would do Plaintiff's surgery. TR 136.

On January 2, 2003, Dr. Jordan prescribed Plaintiff more Talwin. TR 136. On January 3, 2003, Plaintiff complained to Dr. Jordan that he was not happy with Dr. Cushman and wanted another referral. *Id.* Plaintiff was referred to Dr. G. Lanford. *Id.*

12

On January 6, 2003, Plaintiff visited Dr. Gregory Lanford at Neurological Surgeons, P.C. and completed a New Patient Medical Questionnaire. TR 165-168. Plaintiff listed his chief complaints as back pain and leg pain, indicating that he had had previous surgeries and took Pentazocine. *Id.* In the Review of Symptoms section, Plaintiff indicated that he experienced dizziness, severe back pain, calf pain when walking, trouble sleeping, and lack of energy. *Id.* He also indicated that he had hepatitis C. *Id.* Dr. Lanford noted that Plaintiff's MRI, CT, and myelogram revealed recurrent disc rupture at L5-S1 on the left and agreed with Dr. Cushman that operative intervention was appropriate. TR 163.

On January 8, 2003, Dr. Lanford performed a lumbar discectomy at L5-S1, removing Plaintiff's subligamentous disc rupture. TR 156-160. Dr. Lanford discharged Plaintiff to the outpatient area the same day with a prescription for Lortab. *Id.*

On February 6, 2003, Dr. Lanford noted Plaintiff's greater than 80% improvement and ability to walk three miles per day. TR 155. Dr. Lanford reported a well healed surgical scar, a negative straight leg raise test, and a stable neurological examination. *Id.* Plaintiff had a lumbar range of motion normal into flexion with a minimal loss of extension and greatly diminished left-side S1 pain. TR 152. Plaintiff was to remain off work, perform post-operative exercises (including extension, progressive walking, soft tissue stretching, flexion, and strengthening and conditioning programs), and return for a follow-up appointment in six weeks. TR 152-155.

On February 17, 2003, Dr. Jordan referred Plaintiff to Dr. M. Ezell for an appointment scheduled for the same day. TR 135.

On February 26, 2003, Plaintiff visited Ms. Kimberly L. Fletcher, M.S.P.T., at Neurological Surgeons and reported that none of his extension exercises or nerve glides had

13

helped or aggravated his pain symptoms. TR 151. Ms. Fletcher recommended lying prone for five minutes, lying prone on the elbows, and press-ups for further exercise. *Id.* If those exercises did not help, Ms. Fletcher recommended calling a doctor for possible medication. *Id.*

On March 19, 2003, Ms. Julianne LaGasse, G.N.P., reported that Plaintiff was improving, but nervous about re-injuring himself after the third surgery. TR 150. Plaintiff rated his pain at a 4 out of 10. *Id.* Ms. LaGasse noted that Plaintiff should increase his walking distance and go to physical therapy twice a week for 4 weeks. *Id.*

On March 20, 2003, Dr. Jordan referred Plaintiff to Star Physical Therapy per the request of Dr. Lanford. TR 135.

On April 10, 2003, Physical Therapist Tammy Rogers reported that Plaintiff had not responded to PT intervention and would benefit from further evaluation. TR 149. She wrote that Plaintiff complained of difficulty sitting and getting out of bed in the morning. *Id.* Ms. Rogers also observed that Plaintiff "still demonstrated guarding during transfers from sit to/from lying and during gait." *Id.*

On April 30, 2003, Plaintiff visited Ms. LaGasse reporting no improvement with physical therapy. TR 148. Plaintiff's physical examination revealed a positive right crossed straight leg raise. *Id.* Ms. LaGasse noted that Plaintiff was to visit his primary care physician to monitor his hepatitis C and for determination whether Plaintiff would be a candidate for treatment with Neurontin. *Id.*

On August 21, 2003, Dr. Grafton H. Thurman[2] performed a consultative examination of Plaintiff for Tennessee Disability Determination Services. TR 169-179. Dr. Thurman noted that

---

[2] The examiner was Mark Orr; Dr. Thurman was the signatory.

14

Plaintiff complained of degenerative disc disease, peripheral joint arthralgia, hepatitis B and C, asthma, and sinus allergies.[3]  TR 169.  Dr. Thurman also noted Plaintiff's history of three back surgeries.  TR 169-170.  Plaintiff's medications were listed as: Carisoprodol, Propoxyphene, Methylpred, Propo/N/APAP, Meprozine, and Pentazocine.  TR 170.

Dr. Thurman's physical examination revealed that Plaintiff had no shortness of breath or chest pain, walked with a "good steady gait," and got off the exam table "slowly and stiffly."  TR 171-172.  Dr. Thurman noted wheezes in the basis and mid lung fields and an increased inspiratory phase of respiration.  TR 172.  Plaintiff had full range of motion in the peripheral joints and exhibited no evidence of significant peripheral joint deformity.  *Id.*  Plaintiff had full range of motion in his cervical spine and 40 degrees of anterior flexion, 20 degrees of extension, and 25 degrees of left and right lateral flexion in his dorsolumbar spine.  TR 172-173.  Plaintiff had 20 degrees of right and left straight leg raising.  TR 173.

Dr. Thurman opined that Plaintiff's lumbar sacral spine x-ray demonstrated a stable alignment of the spine, a straightening lumbar lordosis due to paraspinal muscle spasm, well-preserved disc spaces, marked narrowing of only the L5-S1 disc space, and no significant osteophyte formation.  TR 173.  Regarding Plaintiff's pulmonary function study, Dr. Thurman commented that Plaintiff should experience "no decrease in the ability to participate in meaningful physical activity as the result of any decrease in pulmonary reserve."  TR 173, 178-179.

---

[3]  There is no other information in the record that suggests that Plaintiff actually suffered from hepatitis B or asthma.

Dr. Thurman completed a Medical Assessment of Ability to do Work-Related Activities (Physical) form regarding Plaintiff. TR 176-177. He opined that Plaintiff could "occasionally" lift and/or carry 10 pounds, "frequently" lift and/or carry less than 10 pounds, stand and/or walk for at least two hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday. *Id.*

On August 29, 2003, DDS Physician Dr. Reeta Misra completed a Physical Residual Functional Capacity Assessment form regarding Plaintiff. TR 180-185. Dr. Misra opined that Plaintiff could "occasionally" lift and/or carry 20 pounds, "frequently" lift and/or carry 10 pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and was "unlimited" in his ability to push and/or pull. TR 181. Dr. Misra explained Plaintiff's limitations as based on her consideration of the evaluations of Drs. Uteg and Thurman, diagnostic imaging, and Plaintiff's complaints of pain. TR 181-182. Dr. Misra noted that Plaintiff had no manipulative, visual, communicative, or environmental limitations. TR 182-185. She did note, however, that Plaintiff should "never" climb ladders, ropes, or scaffolds, and only "occasionally" climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. TR 182. Dr. Misra opined that Plaintiff's pain symptoms were "credible" based on x-rays, prior back surgeries, and his decreased range of motion. TR 184.

On September 3, 2003, Plaintiff returned to Dr. Allen complaining of chest and back pain. TR 194-196. Dr. Allen noted that he had not seen Plaintiff since 1998. *Id.* Dr. Allen diagnosed Plaintiff with chronic hepatitis C, thrombocytopenia, "CP," "HTN," and back pain. *Id.* He prescribed Aciphex, Darvon, and a diet/exercise program. *Id.* Plaintiff's blood test results revealed elevated levels of alkaline phosphatase, "AST," "ALT," hemoglobin, "MCH,"

16

and platelets. TR 212-215. Plaintiff's urinalysis returned normal results. TR 214. Plaintiff also underwent a treadmill exercise test which revealed Plaintiff's heart rate capacity of 84% and aerobic capacity of 81%. TR 216-224. These results gave the impression that Plaintiff was "subjectively and objectively" "clinically negative" for ischemia. *Id.*

On March 30, 2004, Dr. Antonio M. Granda wrote to Dr. David S. Raiford at The Vanderbilt Clinic regarding Plaintiff's cirrhosis of the liver, hepatitis C, and previous history of alcohol use. TR 187. Dr. Granda expressed concern with treating Plaintiff, considering his limited bone marrow reserve and advanced liver disease. *Id.*

On May 6, 2004, Dr. Raiford wrote a letter to Dr. Granda regarding Plaintiff's referral for possible cirrhosis and chronic hepatitis C. TR 186. Dr. Raiford reported that his impression was that Plaintiff had cirrhosis, but that his liver function was well-compensated. *Id.* Plaintiff had genotype 1a virus with a relatively high viral load, as well as a history of non-responsiveness to interferon, which indicated to Dr. Raiford that Plaintiff would experience a low likelihood of sustained response to antiviral therapy. *Id.* Dr. Raiford nevertheless suggested that Plaintiff be offered therapy with PEG-interferon and ribavirin for 12 weeks. *Id.* Dr. Raiford also recommended that Plaintiff be vaccinated for hepatitis A and B, lose weight, and quit smoking. *Id.*

On June 19, 2004, Plaintiff's hematology report revealed his elevated levels of direct and total bilirubin, "AST," "ALT," "MCH," and absolute lymphocytes; and his low levels of red blood cells, hemoglobin, hematocrit, and platelets. TR 190-191. Dr. Granda noted that Plaintiff needed a complete blood count done weekly in order to safely continue treatment. *Id.*

17

On July 2, 2004, Plaintiff's CBC indicated a "definitive flag" for "1+ anisocytosis." TR 188. On July 12, 2004, another hematology report revealed Plaintiff's low red blood cell count, hemoglobin, hematocrit, platelet count, and absolute neutrophils, and elevated "MCV," "MCH," and "RDW." TR 189.

On October 12, 2004, Dr. Allen wrote a letter regarding Plaintiff's history of hepatitis C, multinodular cirrhosis, and ascites. TR 193, 235. Dr. Allen opined that Plaintiff's treatment had been complicated by severe chronic fatigue, abnormal liver function tests, and thrombocytopenia. *Id.* Dr. Allen concluded by commenting that Plaintiff was "unable to do even sedentary work for more than three hours at a time due to his chronic active hepatitis with cirrhosis complicated by severe fatigue," and he opined that Plaintiff was "completely disabled and unable to work." *Id.*

On October 20, 2004, Plaintiff visited Dr. Allen for a follow-up examination. TR 239. Dr. Allen diagnosed Plaintiff with peptic ulcer disease, arthralgia, back pain, and hepatitis C with cirrhosis. *Id.* He prescribed Aciphex and Bextra, and noted that Plaintiff was already taking other medications. *Id.*

On October 25, 2004, Dr. Raiford wrote a letter to Dr. Granda regarding Plaintiff's discontinued PEG-interferon and ribavirin therapy because of an inadequate fall in Plaintiff's C RNA level and marked thrombocytopenia. TR 233. Dr. Raiford commented that Plaintiff had been non-responsive to therapy, that but his liver function was well-preserved nevertheless. *Id.* Dr. Raiford considered an option of transplantation premature and counseled Plaintiff to not use aspirin or NSAIDs, to quit smoking, and to lose weight. *Id.* Dr. Raiford additionally

18

recommended that Plaintiff's AFP levels should be measured semi-annually as surveillance against hepatocellular carcinoma and that continuing care should be supportive in nature. *Id.*

On December 20, 2004, Plaintiff visited Dr. Allen for a follow-up examination regarding back pain, chronic hepatitis C, multinodular cirrhosis, former "mild ETOH use," mild thrombocytopenia, and hand arthritis. TR 238. Dr. Allen refilled Plaintiff's Mepergan and instructed him to follow up in three months. *Id.*

On March 17, 2005, Plaintiff visited Dr. Allen for a follow-up examination regarding his back pain, chronic hepatitis C, multinodular cirrhosis, former "mild ETOH use," mild thrombocytopenia, and hand arthritis. TR 237. Dr. Allen noted that Plaintiff was taking the medications Aciphex, Intron, Mepergan, Neurontin, and Spironalactone. *Id.* Plaintiff was given more Mepergan and Dr. Allen noted that he should review Plaintiff's arthritis associated with the hepatitis C with rheumatology. *Id.*

On May 31, 2005, Dr. Allen wrote to Plaintiff informing him that he might have rheumatoid arthritis, as indicated by laboratory test results, for which he could take cortisone. TR 240. Dr. Allen also opined that it would be reasonable for Plaintiff to undergo a "sl[e]ep evaluation." *Id.*

On March 30, 2006, Plaintiff's laboratory test results revealed an elevated level of ammonia in his blood at 72 mmol/L. TR 243. Plaintiff's laboratory tests also revealed elevated glucose, alkaline phosphatase, "ALT," "AST," hemoglobin, "MCH," and low a platelet count. TR 244-245.

On April 17, 2006, Dr. Gary L. Witucki, D.O., of the Cumberland Family Practice wrote a letter indicating that Plaintiff suffered from chronic low back pain with radicular pain, chronic

hepatitis, hypertension, fatigue, thrombocytopenia, ascites secondary to hepatitis, coagulopathy, GERD, depression, and nicotine abuse.  TR 241.  Dr. Witucki opined that Plaintiff could lift less than 10 pounds "frequently," stand and/or walk for less than two hours in an eight-hour workday, and was "limited" in his lower extremities in his ability to push or pull.  *Id.*  Dr. Witucki also wrote that Plaintiff would have to alternate sitting and standing to relieve pain and discomfort and that he would be "limited" by fatigue from chronic hepatitis C.  *Id.*

Dr. Witucki further opined that Plaintiff should "never" crawl, crouch, or climb, and should only "occasionally" balance, kneel, or stoop.  *Id.*  He commented that Plaintiff was not limited in manipulative functions except when having to be done in conjunction with postural and exertional limitations.  *Id.*  He opined that Plaintiff was additionally environmentally limited in exposure to extreme temperatures, noise, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals, and gases.  *Id.*

## B.  Plaintiff's Testimony

Plaintiff testified that, at the time of the hearing, he was 48 years old.  TR 259.

Plaintiff testified that his back problems had begun with "long sitting... as an over-the-road trucker" and with loading and unloading his truck.  TR 259.  Plaintiff stated that the pain had worsened such that he "could not sit... in the seat of a truck very long."  *Id.*

Plaintiff reported that he had seen a physician regarding left leg pain and that he had had surgery to correct a "nerve problem" that would make his leg "just give away."  TR 260.  This surgery was not successful, according to Plaintiff, because he had had to have another surgery two months later.  *Id.*  Plaintiff then testified that an additional surgery was performed later, for a

total of three surgeries.  *Id.*  Plaintiff believed that these surgeries had taken place in December

2001, January 2002, and January 2003.  TR 260-261.

Plaintiff testified that he had quit working in November 2002, seven weeks before his

surgery in January 2003.  TR 261.  Plaintiff reported that this surgery had taken place at St.

Thomas Hospital and that he was not able to return to work following the procedure.  *Id.*  He

stated that the surgery had relieved his pain "immediately," but that during the "healing process"

he "continually started having blowouts again."  TR 262.  Plaintiff stated that his leg and ankle

felt the way that they did before the first surgery, like he had "worms" in his leg.  *Id.*  He

reported that he took 600 mg of Neurontin per day for this condition.  *Id.*  Despite this

medication, Plaintiff testified that he still had the "nerve problem" and experienced pain in his

buttocks and in the back of his leg and knee, with a "problem" in his ankle.  TR 263.

Plaintiff testified that he could not take pain medication for his back, with the exception

of Mepergan, because of his hepatitis C.  TR 263.  Plaintiff also stated that his doctor would not

prescribe anti-inflammatories.  TR 264.  He stated that he had learned to live with the pain in his

back and that he knew what his limitations were.  *Id.*  Plaintiff testified that the Mepergan caused

a side effect of fatigue, which made him need to lie down for up to three hours a day and sleep

for up to 13 hours per day.  *Id.*

Plaintiff testified that he had been diagnosed with hepatitis C in 1995, and that he had

taken interferon injections three times a week.  TR 264-265.  Plaintiff stated that when Dr.

Granda told him that he was no longer a candidate for that kind of treatment, he began seeing Dr.

Rayford at Vanderbilt for a new "long lasting pegasus interferon and 1,000 milligrams of

ribavirin a day."[4]  TR 265.  This medicine, Plaintiff reported, had made his hair fall out, his platelet count fall, and made him bleed from his rectum, so he was taken off the injections and placed on a liver transplant list.  *Id.*

Plaintiff clarified that Drs. Allen and Granda were part of the same medical group at St. Thomas Hospital and that Dr. Rayford was at Vanderbilt University Hospital.  TR 266.  Plaintiff stated that he was then waiting to see if there was another treatment, short of a liver transplant, that could help him.  *Id.*

The ALJ interjected and stated that she believed that Exhibit 12F at page 2 demonstrated that Dr. Rayford had said that Plaintiff was not a candidate for the transplant list at the time of the hearing.  TR 267.  Plaintiff's attorney acknowledged that this was correct.  *Id.*

Plaintiff then testified that Dr. Allen had told him that he had arthritis in his hands and elbows, and that this was a symptom of progressing hepatitis.  TR 267-268.  Plaintiff acknowledged that his hands and elbows caused him problems and had limited his ability to do things around the house.  TR 268.  Plaintiff stated that he did not "do near as much around the house" as he used to do and that he had to hire someone to cut his grass.  *Id.*

Plaintiff stated that the pain in his back and legs was present "all the time" and that the pain in his buttocks would "come and go."  TR 269.  Plaintiff additionally reported that he experienced a heat sensation in his back in the "L5 area" "all the time."  *Id.*  He also reported having "charley horses" at night if he moved his leg "just right" while his "nerves are jumping." *Id.*  Plaintiff testified that he did not get complete relief from his back pain with Mepergan because he only took two per day.  *Id.*

_____

[4]  Dr. David S. Raiford's name is incorrectly spelled in the transcript of the hearing.

22

Plaintiff acknowledged that he experienced fatigue from hepatitis and his Mepergan medication on a daily basis, stating that he would get up early around 7:00 am, then lie back down about 10:30 am and rise around noon, then lie down again at 3:30 pm, and was generally asleep by 7:30 pm. TR 269-270. Plaintiff stated that he would lie down in the mid-afternoon for between one to two hours depending on whether he "actually [fell] off into a deep sleep." TR 270. Plaintiff reported that he would fall asleep "most of the time" in this situation. *Id.*

Plaintiff stated that he was able to do only "little chores." TR 271. Plaintiff reported that he would load the dishwasher and make sure that clothes were in the laundry room. *Id.* He testified that his son-in-law performed the yard work. *Id.*

Plaintiff testified that he did not drive "much at night" or "go like [he] used to." TR 271. Plaintiff denied that he would go out of the house to do anything for fun or that he belonged to any organizations. *Id.* Plaintiff stated that he attended church "occasionally, not every Sunday" and that he had difficulty sitting depending on "what kind of pews they have." TR 272. Plaintiff also reported that he had difficulty riding long distances in a vehicle and that he generally had to get up to move every 45 minutes if he was sitting in an upright position. TR 272-273. Plaintiff stated he had tried to walk every day, but that his leg and ankle hurt so badly that he did not walk much anymore. TR 273. Plaintiff reported that he could stand on his feet for "thirty minutes or so" without needing to sit down or rest. *Id.* He stated that he would sit on benches in the front of the store while his wife did the shopping at Wal-Mart. *Id.*

Plaintiff acknowledged that he had trouble sleeping at night, stating that it was because of the nerves in his legs and "charley horses." TR 273-274. He said that he would wake up with

23

this feeling four nights out of a week. *Id.* Plaintiff reported that after one of these episodes, his leg would be sore all the next day. TR 274.

Plaintiff testified that when he would have "blowouts," his wife would have to tie his shoes and put his socks on his feet. TR 274. This was the only difficulty with doing his personal care activities that Plaintiff mentioned. *Id.* Plaintiff described a "blowout" as having so much pain that he could not move around. *Id.* Plaintiff stated that, "over the years," these incidents had only occurred once or twice every two years, but that before his first surgery they would occur four to six times a year. TR 275. He stated that he had fewer "blowouts" because he was taking fewer chances reaching and bending for things, and being "real, real, real careful" even reaching into the refrigerator for a gallon of milk. TR 275-276.

Plaintiff stated that he had a "belly," acknowledging that this was partially due to his liver condition which caused him to retain fluid, for which he took medication every day. TR 274.

Plaintiff then testified that he had attempted to return to work as a local dump truck driver between his second and third surgeries. TR 276. He stated that his employer had not had him perform any other duties besides drive the truck, yet he "still didn't hold up." TR 276. Plaintiff also stated that he had had difficulty being able to report to work on a regular basis because he was going to doctors appointments. *Id.* Plaintiff testified that this job lasted from one to three months, although he could not be sure. TR 277.

Plaintiff told the ALJ that he had no other work experience besides that of a truck driver and that he still smoked about a half a pack of cigarettes per day. TR 277. Plaintiff also reported that he did not have asthma. *Id.*

24

## C.  Vocational Testimony

Vocational Expert ("VE"), Dr. Kenneth Anchor, also testified at Plaintiff's hearing.  TR 278-282.  With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's work as a truck driver was his only vocationally relevant occupation.  TR 279.  The VE testified that this job was medium exertion, semi-skilled work.  *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past.  TR 279.  The ALJ asked the VE to consider that this individual would have the residual functional capacity to perform sedentary work which would not require climbing ladders, ropes, or scaffolds, would not require crawling, would require only occasional climbing of ramps and stairs, only occasional balancing, stooping, kneeling, and crouching, and would not involve work around food preparation.  *Id.*

The VE answered that the hypothetical claimant would not be able to perform Plaintiff's past relevant work.  TR 279.  The VE testified that some examples of jobs that would accommodate a hypothetical claimant with those limitations are the job of table worker at 460,000 positions in the national economy, the job of cashier II at 600,000 positions in the national economy, and the job of telephone quotation clerk at 340,000 positions in the national economy.  TR 279-280.

The ALJ presented the VE with a second hypothetical that preserved the limitations of the first hypothetical, but added an additional restriction of "frequent but not constant handling

and fingering." TR 280. The VE testified that the same jobs would be available, as well as others.[5] *Id.*

The ALJ presented the VE with a third hypothetical that preserved the limitations of the second hypothetical, but modified the "frequent" limitation on handling and fingering to only "occasional." TR 280. The VE testified that only the job of telephone quotation clerk would remain available to the hypothetical claimant. TR 280-281. He also stated that the jobs of credit card control clerk at 280,000 jobs in the national economy, and general office clerk at 575,000 jobs in the national economy, would be available for this hypothetical claimant. TR 281.

The ALJ presented the VE with a fourth hypothetical that preserved the previous limitations, but added the additional restriction that the claimant would miss work one day per week on average because of fatigue or back pain. TR 281. The VE testified that this level of absenteeism would be "above the threshold for what would be permissible or acceptable." *Id.*

The ALJ asked the VE if there would be any jobs available for a hypothetical claimant who could not work a full eight-hour day, but could work only four to six hours per day. TR 281. The VE testified this limitation would not allow for a full-time work schedule. *Id.*

During examination by Plaintiff's attorney, the VE testified that Dr. Allen's letter dated October 12, 2004, described restrictions that would not allow an individual to engage in gainful work activity. TR 282.

_____

[5]The VE did not specify what those additional jobs would be because the ALJ stated that he did not need to hear "any other" positions. TR 280.

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

Case 3:06-cv-01186   Document 21   Filed 06/20/08   Page 27 of 41 PageID #: 98

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the

28

"listed" impairments[6] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

---

[6] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in not according appropriate weight to the opinion of Plaintiff's treating physician; in improperly discrediting Plaintiff's subjective complaints of pain; in relying upon testimony from the Vocational Expert that did not comport with the Dictionary of Occupational Titles; and in applying Social Security Ruling 96-9p.  Docket Entry No. 15, 6-11.  Also, Plaintiff contends that the submission of new and material evidence requires remand for the ALJ's reconsideration of the case.  *Id.* at 11.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or, in the alternative, remanded.  *Id.* at 12.

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or
> reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record

adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171,

176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1.  Weight Accorded to the Opinion of Plaintiff's Treating Physician

Plaintiff argues that the ALJ erred in not according appropriate weight to the opinion of

Dr. Allen, Plaintiff's treating physician.  Docket Entry No. 15, at 6.

With regard to the evaluation of medical evidence, the Code of Federal Regulations

states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
> (3) Supportability.  *The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.* ...

31

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

...

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, she is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

Dr. Allen treated Plaintiff intermittently over a period of 11 years, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions.  As the ALJ noted in her decision, however, Dr. Allen's October 12, 2004, opinion contradicts other substantial evidence in the record that Plaintiff could engage in a significant range of sedentary work.  TR 23-25.  As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2).  Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above.  *Id.*

32

The ALJ's opinion reveals that she considered the opinion of Dr. Allen and properly weighed his assessment of Plaintiff against the assessments of Dr. Thurman and the DDS medical consultants, who concluded that Plaintiff could engage in sedentary and light work, respectively. TR 23-24. The ALJ specifically noted that Dr. Allen's opinion was accorded less weight because it was not consistent with Plaintiff's treatment records, which did not document a history of ascites, persistent fatigue associated with hepatitis C, or a constant dependency on medication for back pain or arthritis. *Id.* The ALJ also noted that although Plaintiff did have thrombocytopenia, "this condition was considered mild." *Id.*

The ALJ's findings are supported by the Record. In August 2003, upon physical examination of Plaintiff, Dr. Thurman noted that Plaintiff had no apparent shortness of breath, had a "good steady gait," and had a full range of motion in his peripheral joints and no evidence of significant peripheral joint deformity. TR 171-172. Additionally, in September 2003, Dr. Allen examined Plaintiff and noted that Plaintiff had a "good energy level" and "feels well." TR 195. Moreover, Plaintiff was not actually diagnosed with ascites. *See* TR 187. In October 2004, Dr. Raiford noted that Plaintiff's liver function was "well preserved"; that Plaintiff appeared "in no distress" and looked "generally well"; and that Plaintiff needed only supportive care of his liver disease. TR 233.

Because Dr. Allen's opinion was inconsistent with other evidence of record, the Regulations do not mandate that the ALJ accord Dr. Allen's evaluation controlling weight. Accordingly, Plaintiff's argument fails.

33

**2.  Consideration of Plaintiff's Subjective Complaints of Pain**

Plaintiff contends that in finding that his subjective complaints were not fully credible, the ALJ did not appropriately address his complaints of pain.  Docket Entry No. 15, at 7-8.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other

34

treatment or measures to relieve pain.  *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)).  After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible.  *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the case at bar, the ALJ found that Plaintiff's allegations regarding his limitations were not fully credible.  TR 26.  Specifically, the ALJ articulated that Plaintiff's ability to pass the day watching television contradicted his testimony that he could not sit for longer than a few minutes at a time.  TR 24.  Plaintiff correctly argues that he did not testify at his hearing to "pass[ing] the day watching television," but Plaintiff did report in his October 10, 2003, Fatigue Questionnaire, however, that "now about all I do is watch TV."  TR 94. Significantly, the ALJ did not base her credibility finding solely on Plaintiff's watching television.  The ALJ noted other testimonial evidence such as Plaintiff's abilities to wash dishes, do light dusting, and cook light meals, to support her belief that Plaintiff was not as limited in his ability to stand/sit as he testified.  The ALJ additionally noted that Plaintiff testified to "occasionally" attending church, riding in vehicles, and sitting on benches at Wal-Mart while his wife shopped.  TR 23, 271-273. Moreover, the medical assessments of Drs. Misra and Thurman also indicated that Plaintiff could sit for six hours in an eight-hour workday.  TR 176-177, 181.  Furthermore, the ALJ considered Plaintiff's subjective complaints of pain, noting that he alleged back, buttock, leg, arm, elbow, and knuckle pain because of hepatitis C and degenerative disc and joint disorders.  TR 23.

35

The ALJ's decision specifically addresses not only the medical evidence, but also Plaintiff's testimony and his subjective claims, indicating that these factors were considered. TR 23-24. It is clear from the ALJ's articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler,* 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

The ALJ observed Plaintiff during his hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

36

### 3.  Existence of a Significant Number of Jobs

Plaintiff argues that the ALJ erred in relying upon testimony from the VE that did not comport with the Dictionary of Occupational Titles (DOT).  Docket Entry No. 15, at 9.

Plaintiff contends that the VE's description of two of the four jobs he offered in testimony, namely "cashier II" and "credit card control clerk," failed to accurately depict the true DOT descriptions of the work and were actually excluded by Plaintiff's residual functional capacity.[7]  *Id* at 9-11.  These observations are well-taken.  Removing the availability of the cashier II and credit card control clerk positions, however, the VE testified to the availability of 460,000 table worker positions, "in excess of" 340,000 telephone quotation clerk positions, over 575,000 general office clerk positions, and "others as well."  TR 279-281.  These positions alone demonstrate that work exists in significant numbers in the national economy that Plaintiff could perform.

Because the VE correctly identified work that exists in significant numbers in the national economy that Plaintiff could perform, Plaintiff's argument that the ALJ did not satisfy her burden at Step Five of the sequential evaluation process fails.

### 4.  Social Security Ruling 96-9

Correlated with Plaintiff's argument regarding the VE's "flawed" testimony discussed above, Plaintiff argues the ALJ erred by not making an individualized determination about Plaintiff's ability to work pursuant to Social Security Ruling 96-9p.  Docket No. 15, at 8-9.  Plaintiff essentially argues that the ALJ could not properly make an individualized determination

---

[7]  The VE actually identified five jobs available to a hypothetical claimant with Plaintiff's limitations.

about Plaintiff's ability to work if that determination was based upon the VE's "flawed" testimony. *Id.*

Plaintiff does not contend that the VE's hypotheticals did not accurately reflect Plaintiff's limitations, that Plaintiff's residual functional capacity was wrongly determined, that Plaintiff could not perform the other available positions correctly identified by the VE, or that those jobs do not exist in significant numbers. Rather, Plaintiff contends that the VE wrongly identified two positions as being available for the hypothetical claimant, and that because of this, the ALJ could not rely upon the VE's testimony in determining whether an individual with the same age, education, and vocational background (including transferable skills) as Plaintiff could retain a residual functional capacity for less than a full range of sedentary work, as determined by the ALJ. *Id.*

As discussed above, however, the VE properly identified several positions that would be available for Plaintiff and that existed in significant numbers in the economy. Because the ALJ included consideration of Plaintiff's age, education, and vocational background in her hypothetical questions to the VE, and because the VE's testimony was not materially flawed, it was within the province of the ALJ to rely upon it. Accordingly, Plaintiff's argument fails.

**5. New and Material Evidence**

Plaintiff argues that the March 31, 2006 laboratory test results and April 17, 2006, letter from Dr. Gary L. Witucki, D.O., constitute new and material evidence, and that the Court should remand the case for the ALJ's reconsideration pursuant to Sentence Six of 42 U.S.C. § 405(g). Docket Entry No. 15 at 11.

Remand pursuant to Sentence Six of 42 U.S.C. § 405(g) for consideration of new and material evidence is appropriate only when the claimant shows that: (1) new material evidence is available; *and* (2) there is good cause for the failure to incorporate such evidence into the prior proceeding. *Willis v. Secretary*, 727 F.2d 551, 554 (6th Cir. 1984).

Plaintiff submitted the letter and laboratory results from Dr. Witucki's office (TR 241-246) on April 17, 2006, as an enclosure in his letter to the Appeals Council. TR 247-252.

The regulations provide that where new and material evidence is submitted with the request for review, the entire record will be evaluated and review granted where the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence. 20 C.F.R. § 416.1470. After reviewing Dr. Witucki's opinion and the record as a whole, the Appeals Council determined that there was no basis under the regulations for granting Plaintiff's review. TR 4-8.

As an initial matter, Plaintiff cannot establish that Dr. Witucki's records are material. "In order for the claimant to satisfy his burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988) (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). Dr. Witucki's opinion of Plaintiff's residual functional capacity was based on only one document in the record and is largely conclusory without supporting, objective medical evidence. The record in the case at bar is replete with other doctors' evaluations, medical assessments, test results, and the like, all of which constitute "substantial evidence" to support the conclusion reached.

39

As explained above, the ALJ's decision must be supported by "substantial evidence." "Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion" (*Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401)), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance" (*Bell*, 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229)).

Even if Dr. Witucki's evaluation had been part of the record before the ALJ, Dr. Witucki's evaluation is largely unsupported by objective medical evidence and "substantial evidence" supports the ALJ's findings and inferences. The ALJ's decision demonstrates that she carefully considered the testimony of both Plaintiff and the VE, observed Plaintiff during his hearing, assessed the medical records, and reached a reasoned decision. Additionally, the Appeals Council reviewed Dr. Witucki's opinion, as well as the record as a whole, and determined that the information contained in Dr. Witucki's letter did not warrant changing the ALJ's decision. TR 4-8. Thus, there is no "reasonable probability that the Secretary would have reached a different disposition of the disability claim" if Dr. Witucki's letter had been part of the record before the ALJ. Plaintiff has therefore failed to demonstrate that Dr. Witucki's letter is material.

Because Plaintiff has failed to demonstrate that the new medical evidence was material, i.e., that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence, remand pursuant to Sentence Six of 42 U.S.C. § 405(g) is not warranted.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's "Motion for Judgment Upon the Administrative Record" be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in this Report in which to file any response to said objections.  Failure to file specific objections within ten (10) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge

41